**HUNT OIL COMPANY et al., Appellants,**

v.

**S. D. KILLION et al., Appellees.**

No. 6910.

Court of Civil Appeals of Texas.

Texarkana.

Feb. 7, 1957.

Rehearing Denied March 7, 1957.

Ramey, Calhoun, Brelsford & Hull, Smith & Smith, Truman Warren and Warren McDonald, Tyler, Shank, Dedman & Payne, Dallas, for appellant.

Allen Wight, Dallas, Spruiell, Lowry, Potter & Lasater, Tyler, for appellee.

FANNING, Justice.

Hunt Oil Company and Hassie Hunt Trust sued Smith County Livestock Auction, S. D. Killion, Trinity Universal Insurance Company and Judge Ned Price, County Judge of Smith County, Texas, to recover on two certain livestock Commission Merchants Bonds. Lum Brothers Stockyards, Inc., W. E. Burge and Bill Gunn intervened, asserting similar causes of action against the same defendants. A trial before the court, without a jury, resulted in a judgment that plaintiffs and interveners should take nothing against the defendants. The trial court filed findings of fact and conclusions of law. Plaintiffs and interveners have appealed.

Appellants contend that the trial court erred in holding (1) that the bonds in question were not statutory bonds, (2) that the withdrawal of one partner terminated the liability of the surety on the bonds, (3) that the surety on the bonds was not estopped to plead termination of its liability because of the withdrawal of one partner from the partnership. Appellant Lum Brothers Stockyards, Inc., makes the additional contention by its 4th point that the trial court erred in holding that its claims did not come within the scope of the bonds or of Article 1287a, Vernon's Ann.Civ.St.

The claims of plaintiffs and intervener Burge were based upon sales of cattle, and of intervener Gunn on the sale of hogs, to Smith County Livestock Auction, Shirley Shores, owner, in Tyler, Smith County, Texas, on dates from June 11th to June 29th, 1954, wherein the checks given by Shores to said parties were not paid. Shores later became a bankrupt. Some of the parties involved in this suit filed claims in this bankruptcy proceeding and received partial dividends thereon which they would credit on their present claims. Lum Brothers Stockyards, Inc., on June 24, 1954, sold cattle in Natchez, Mississippi, to W. J. Browning who gave a draft in payment for the cattle on Smith County Livestock Auction, c/o Peoples National Bank, Tyler, Texas, which draft was payable to Lum Brothers Stockyards, Inc., and was signed, Shirley Shores by W. J. Browning. Lum Brothers Stockyards, Inc., also were assigned the claims of Delhi Livestock Auction and Roy Kirk Livestock Commission, which claims were similar to the original Lum Brothers' claim, as in these instances the cattle in question were bought by Browning from these livestock auction companies in Monroe, Louisiana, and Alexandria, Louisiana, with similar drafts drawn and signed "Shirley Shores by W. J. Browning." The trial court found that the cattle involved in the Lum Brothers' claim were moved to Tyler and resold through the Smith County Livestock Auction and further found that it was not shown how the proceeds of these resales were disposed of. Fact findings 1 to 7, inclusive, set out the facts with reference to the claims of plaintiffs and interveners. Fact findings 8 to 22, incl., are as follows:

"8. Each of the checks and drafts referred to above were promptly presented for payment to the bank upon which they were drawn and payment of each was rejected because of insufficient funds. The purchase price for said livestock was not paid by Smith County Livestock Auction within forty-eight hours of such sales excluding the day of such sales, Sundays and holidays. Nor was any part of the purchase price for the same either paid by Smith County Livestock Auction or deposited in any bank to the credit of the seller.

"9. Each of the invoices referred to above, given by Smith County Livestock Auction to evidence the sale through its auction, contains this phrase, conspicuously placed on the invoice—'Smith County Livestock Auction, Shirley Shores, Owner.' Each of the checks referred to, given to pay the purchase price for stock sold through Smith County Livestock Auction contained the wording:

" 'Smith County Livestock Auction Shirley Shores.'

"10. Smith County Livestock Auction was originally a partnership composed of S. D. Killion and Doc Parmley, organized in July, 1949. In October, 1950, Lyle McClellan purchased the interest of Parmley. McClellan and Killion as equal partners continued to do business until October 1, 1951. At that time Killion bought McClellan's interest and immediately sold a one-half interest to Shirley Shores. Shores and Killion continued as equal partners until October 1, 1953. At that time Shores bought Killion's interest and continued to do business as sole owner until he took voluntary bankruptcy July 19, 1954.

"11. The successive partnerships used the name Smith County Livestock Auction and engaged in the livestock auction business but none of the partnership ever filed an assumed name certificate. The name 'Smith County Livestock Auction' was used as much to designate the place of business as the partnership.

"12. While Killion and McClellan were partners they made bond under Article 1287a, R.C.S. This bond was properly filed and showed that Killion and McClellan were partners doing business in the name Smith County Livestock Auction.

"13. Killion and Shores made the two bonds involved in this suit on August 3, 1952. The bonds are for $9,000.00 and $1,000.00, respectively, with 'Smith County Livestock' as principal and are signed 'Smith County Livestock by S. D. Killion, partner.' The name 'Smith County Livestock' was intended to refer to Smith County Livestock Auction in which Killion was a partner.

"14. These bonds, though delivered to Ned Price, County Judge of Smith County, remained in his office and were never filed with the County Clerk. They were not found until after Shirley Shores became insolvent, all the transactions in this suit had occurred and some of his creditors searched for and found them.

"15. S. D. Killion acting in behalf of 'Smith County Livestock' made the applications to Trinity Universal Insurance Company pursuant to which these bonds were signed by it as surety. Among other things these applications contained an indemnity agreement in which it was agreed that 'Smith County Livestock' would indemnify the surety against all claims, loss and damage of any kind which it might suffer as surety.

"16. Immediately after Killion sold his interest to Shores, October 1, 1953, he announced over the public address system from the arena at the auction that he was no longer interested in the Auction, that he had sold his interest to Shores.

"17. When suit was filed Killion served request for admissions under 169, R.C.P. requesting that the plaintiff and interveners admit at the time of the livestock sales involved they had knowledge or notice of his sale to Shores and withdrawal from the Killion-Shores partnership, d/b/a Smith County Livestock Auction. All of them except Bill Gunn admitted they did.

"18. Upon these admissions and from the invoices and checks above referred to given to each of them, and from the public announcement by Killion, the Court finds that each of the plaintiffs and interveners had actual knowledge or notice of Killion's withdrawal from the partnership, and of his sale to Shores. They did not plead that they dealt with Smith County Livestock Auction believing that Killion continued to be a partner. Estoppel is not in the case.

"19. Though Killion sold out to Shores October 1, 1953, neither of them gave notice to Trinity Universal Insurance Company of the change in the partnership until June 22, 1954, when Killion called at the office of Joseph M. Haddad Insurance Agency which had written the suretyship bonds and advised Mrs. Helen McCoy, an employee of that agency, of the termination of the old partnership and requested that the bonds be released. She told him that she would contact Shores with reference to a new bond. There was nothing in this conversation between Killion and Mrs. McCoy which could effect an extension of the old bonds so as to make them cover debts incurred by Shores after the termina-

tion of the Killion-Shores partnership. It was no more than an effort by Killion to obtain the formal release of the old bonds.

"20. Some few days after June 22, 1954, Shores called upon Mrs. Helen McCoy inquiring about the old bonds. She did not agree to continue the old bonds in effect so as to cover debts incurred by Shores. The reason that the Court finds this to have occurred after June 22, 1954, is that Mrs. McCoy already knew about the dissolution of the Killion-Shores partnership when Shores called on her and the only other source to her of this information was that Killion had told her about it on June 22. At this time Shores was already in financial straits. A short time later on July 9, 1954, he filed a voluntary petition in bankruptcy. The Court finds, however, that the liability of Trinity Universal Insurance Company was not extended by this conversation to cover debts of Shirley Shores incurred by him after dissolution of the Killion-Shores partnership. In this conversation Shores did not disclose to Mrs. McCoy that he was in financial straits and had already given some or all of the bad checks involved in this suit in connection with the sale of cattle through his auction. In any event in the absence of such a disclosure of existing liability it would be unreasonable for the Court to find that Helen McCoy intended in behalf of Trinity Universal Insurance Company to assume such obligations.

"21. The bonds involved in the suit are dated August 3, 1952. At this time Article 1287a as amended in 1937 was in effect. Sec. 3 of the statute as it then existed provided that the livestock auction bond should be in the sum of $1,000.00. In 1953, the statute was amended to provide that such bond should not be less than the nearest multiple of $1,000.00 above the aver-

age amount of sales and purchases during two business days. Since the 1953 amendment was not in effect at the time the bonds were given, the bonds must be construed to exist under the law as it was written in 1937.

"22. At the time this suit was filed Shirley Shores was insolvent."

We quote from the trial court's conclusions of law as follows:

"1. The sale by Killion to Shores of his interest in the Smith County Livestock Auction on April 1, 1953, dissolved the Killion-Shores partnership and there could be no subsequently incurred liability against Killion or the Killion-Shores partnership except by estoppel. Since no estoppel is pleaded by any party and because the Court has found that all plaintiffs and interveners had knowledge or notice of the termination of the Killion-Shores partnership, there is no liability by estoppel.

"2. Because all plaintiffs and interveners had knowledge or notice of Killion's sale to Shores and that Shores was the sole owner of Smith County Livestock Auction, Killion was not liable to any of them. The fact that the bonds had not been formally cancelled could not have the effect of creating liability against Killion because the bonds covered only the Killion-Shores partnership debts, a partnership which had terminated long prior to the inception of the debts involved in this suit. The liability of Trinity Universal Insurance Company is that of a surety and does not exceed the liability of the principal. It is not liable for these debts because the Killion-Shores partnership is not liable.

"3. Liability on the bond cannot be affected by questions of estoppel because none of the plaintiffs or interveners had any actual knowledge of the existence of the bonds. All during the transactions involved in this suit

the bonds were in the possession of the County Judge, not filed in the office of the County Clerk, and were not found until later when a search was made for them. Although the invoices issued by Shores in connection with the sales of livestock by plaintiffs and interveners showed that Shores was bonded, they do not show what bond and there is no evidence to show that any of the said creditors checked to see whether a proper bond had been given. Such an examination if made would have shown that the only bonds were those involved in this suit, that they were signed 'Smith County Livestock by S. D. Killion, partner,' prior to the dissolution of the Killion-Shores partnership.

"4. The failure of Trinity Universal Insurance Company to formally cancel the bonds immediately after June 22, 1954, when it first received notice of the termination of the Killion-Shores partnership did not operate to extend or increase its liability as a surety, did not extend the bonds to cover debts of Shores as distinguished from debts of the Killion-Shores partnership.

"5. Because the bonds involved in this suit were never filed by the County Clerk as required by Article 1287a, R.C.S., they were not statutory bonds.

"6. The bonds involved in this case to the extent that they were in excess of $1,000.00 were not statutory bonds because the law in effect at the time they were given provided that they should be in the sum of $1,000.00.

"7. The bonds were sued upon only as statutory bonds and were not supported by any consideration which would support them as common law bonds.

"8. The claims of the intervener Lum Brothers Stockyards, Inc., individually and as assignee of Clay Wilson, d/b/a Delhi Livestock Auction and Roy Kirk, d/b/a Roy Kirk Livestock Commission Market are not within the scope of the bonds or Article 1287a, R.C.S. Their claims arise from livestock sales through other livestock auctions; not from sales of livestock through the Smith County Livestock Auction. It is not the intent of Article 1287a, R.C.S. that every debt incurred by a livestock commission agent should be covered by the bond but only the purchase price for livestock sold through the particular livestock auction designated in the bond.

"9. Neither plaintiffs nor interveners are entitled to recover anything against S. D. Killion, the Killion-Shores partnership or Trinity Universal Insurance Company.

"10. Due to the fact that Shirley Shores was insolvent at the time suit was filed it was unnecessary for him to be joined as a defendant."

We quote from the trial court's additional findings of fact in part as follows:

"1. The two bonds involved in this suit were delivered by Joseph M. Haddad Insurance Company with the following letter:

" 'County Judge Ned Price
Tyler, Texas

" 'Dear Judge Price:

" 'We are enclosing two bonds, one for $1,000 and one for $9,000, to be filed in connection with the operation of the Smith County Livestock. These were previously written by the American Automobile Insurance Company. You will note that the new ones which we are filing have been executed by Trinity Universal Insurance Company.

" 'Please write us a letter releasing the American Automobile Insurance Company on each of these bonds which expire August 3, 1952, and state in your letter that they have been replaced by

two bonds executed by the Trinity Universal Insurance Company.

" 'We trust that this will receive your immediate attention.

" 'Yours very truly,
Joseph M. Haddad Insurance Company
By: S/ Helen McCoy.'

"2. On August 9, Mrs. McCoy wrote a follow-up letter and on August 13, 1952, Judge Price wrote the following reply:

" 'Mrs. Helen McCoy
Joseph Haddad Insurance
Company
Tyler, Texas

" 'Dear Mrs. McCoy:

" 'This letter is to serve as a Release of the American Automobile Insurance Company on the bonds which expire August 3, 1952, covering the operation of the Smith County Livestock. These bonds have been replaced by two new bonds executed by the Trinity Universal Insurance Company.

" 'Yours very truly,
Ned Price, County Judge
Smith County, Texas.'

"3. Notice of the cancellation of the said bonds was never given by any of the parties to the bonds to the County Judge of Smith County.

\*     \*     \*     \*     \*     \*

"5. Paragraph 17 of the original Findings of Fact is amended insofar as it states that W. E. Burge filed an admission under Rule 169, R.C.P. The only admission filed by W. E. Burge under the said rule was as follows:

'That he, W. E. Burge, never at any time attempted to sell the cattle which are the subject matter of his petition, to S. D. Killion or Dude Killion and that, although he had heard that Dude Killion did not have any interest in the

Smith County Livestock Auction, he did not know that S. D. Killion had sold his interest in the Smith County Livestock Auction to Shirley Shores and that neither Dude Killion or Shirley Shores so advised him.'

"The Court construes this as an admission that W. E. Burge had notice that Killion no longer was a partner and that he had no further interest in Smith County Livestock Auction at the time of the transaction in question.

"6. Finding of Fact No. 18 and Conclusion of Law No. 1 are amended to the extent of nothing that Lum Brothers Stockyards, Inc. did plead estoppel against Trinity Universal Insurance Company, that it was estopped to deny liability of the bonds, but the facts do not support the plea."

A sale by one partner of his interest in the partnership to the other partner terminates the partnership with the purchaser continuing as the sole owner even though the purchaser continues to use the trade name of the partnership. 32 Tex.Jur. 494.

In Sherk v. First National Bank, Tex. Com.App., 206 S.W. 507, 509, it is stated:

"It is true that a sale by one partner to another has the effect of dissolving the partnership. It destroys the community of interest and thereafter there is no partnership."

In 32 Tex.Jur. 513–514, it is stated:

"A surviving partner may not create new debts or enter into new contracts except such as are reasonably necessary to settle firm affairs. \* \* \* If the survivor carries on the firm business and incurs debts without authority, he and not the firm is liable."

In 32 Tex.Jur. 475–476, it is stated:

"Estoppel to deny retirement and dissolution is the basis of liability of a retiring member who has given no notice thereof to persons who subsequently

have dealt with the supposed firm relying on its continuance. Such liability must rest on ostensible partnership after retirement, if actual partnership is denied and dissolution is proved. Until such notice the firm is deemed to continue as regards persons who extend credit—especially where there has been no change of firm name. The partnership is bound on a note given by a continuing partner in settlement of a pre-existing firm debt. A secret retirement from an insolvent firm by sale of one's interest to a creditor is fraudulant as to creditors and as to them the original firm remains unchanged.

"Persons who did not rely on the presumptive continuance of the firm, though they may have known of its previous existence, may not recover from a retired partner. A creditor seeking to hold a retired partner must show that there was a partnership and that he was a member thereof, that credit was extended to the partnership in reliance on such membership, and that the creditor was ignorant of the retirement. A person is not estopped to deny membership in a firm as against one who had dealt with it, after his retirement and without knowledge of his having been a member."

We think it is clear under the facts in this case that the Killion-Shores partnership did not exist in fact or by any manner of estoppel at the time of the transactions involved in this suit as found by the trial court upon evidence we hold to be sufficient.

In 45 A.L.R. 1426, it is stated:

"The general rule seems to be that a surety or guarantor of a partnership is not liable in respect of transactions or defaults subsequent to its dissolution by a withdrawal from or an addition to its membership, whether the transaction or default is by a partnership which succeeds the original partnership, or by an individual member of the original partnership; and this, in a majority of the courts, without regard to the question of notice."

The following cases, among others, support the above-quoted statement in A.L.R. to-wit: Dupee v. Blake, 148 Ill. 453, 35 N.E. 867; Standard Oil Co. v. Arnestad, 6 N.D. 255, 69 N.W. 197, 34 L.R.A. 861; State on Behalf of Bickel v. Interstate Surety Co., 48 S.D. 341, 204 N.W. 650; Byers v. Hickman Grain Co., 112 Iowa 451; 84 N.W. 500; Mathews v. Garman, 110 Mich. 559, 68 N.W. 243; Cremer v. Higginson, Fed.Cas. No. 3383, 1 Mason 323; Friendly v. National Surety Co., 46 Wash. 71, 89 P. 177, 10 L.R.A.,N.S., 1160; Gazette Pub. Co. v. Cole, 164 Ark. 542, 262 S.W. 985; London & L. Fire Ins. Co. v. Holt, 10 S.D. 171, 72 N.W. 403; Birch v. De Rivera, 53 Hun. 367, 6 N.Y.S. 206.

In Girard Fire & Marine Ins. Co. v. Koenigsberg, Tex.Civ.App., 65 S.W.2d 783, 786, it is stated:

"A contract of suretyship is an accessory agreement, in the nature of a collateral engagement to pay the principal's obligations. Being an accessory to the obligation of the principal obligor, it is essential that there be a valid obligation of the principal, and the nullity of the principal's obligation necessarily induces the nullity of the accessory. Unless a cause of action exists against the principal, it cannot exist against the surety. The extent of the principal indemnitor's liability determines the liability of the surety."

We think it is clear from this record that the bonds in question secured debts of the Killion-Shores partnership operating under the name of Smith County Livestock Auction and that these bonds were not intended to and did not cover the debts of Shores, d/b/a Smith County Livestock Auction after the dissolution of the Killion-Shores partnership. Since Killion was unquestionably not liable for the debts of Shores after the dissolution of the part-

nership, clearly the surety on the partnership bonds was also not liable for debts created by Shores thereafter.

Appellants argue that a provision in Article 1287a which was incorporated in the bonds in question, compels a holding that the bonds were not terminated, were in full force and effect and covered the transactions in question. This provision in the bonds reads as follows:

"And it is agreed by all parties hereto, principal and sureties, that in the event this bond is terminated, the party terminating shall give at least ten (10) days prior notice in writing to the said Ned Price, County Judge of Smith County, Texas, or his successors in office, in order to effect its termination."

In the case of Birch v. De Rivera, 53 Hun. 367, 6 N.Y.S. 206, a defendant guarantied to plaintiff the return of certain credits to be advanced by them to R. Company with the provision "my said guaranty to hold good until cancelled." After the guaranty was given a change was made in the said firm. The court held that though the guaranty was a continuing one the defendant was not liable for advances made to R. Company after a change in the firm. It was also held that it was immaterial as to whether plaintiffs were notified of the change in partnership. (In the case at bar the court found upon sufficient evidence that plaintiffs and interveners had notice of Killion's withdrawal from the partnership.) In the Birch v. De Rivera case, supra, the court stated:

" * * * There is no doubt that this is a continuing guaranty. The entire instrument so indicates, and the concluding expression, 'my said guaranty to hold good until canceled,' is conclusive. *That, however, only refers to the duration of the credit, not to firm succession.* The rule in England has always been that a guaranty does not continue in force after a change in the principal debtor's firm, unless so expressed in the instrument either directly or by clear implication. The principle is plain. A man may be willing to guaranty A. and B. but be unwilling to guaranty A. and C. So he may be willing to guaranty a firm composed of A. and B., but not a firm composed of A. and C. He may guaranty solely on the strength of B.'s ability or caution. At all events his contract is to guaranty a copartnership firm composed of certain persons, and that contract cannot be altered or extended without his consent.

\*   \*   \*   \*   \*   \*

"The defendant's obligation is not to guaranty any judgment which, owing to collateral circumstances, the original members of the firm may have become liable to; *but the repayment of moneys actually advanced for them while they are in business together, and together constitute the particular firm.*" (Emphasis added.)

As we view it, the 10-day provision above referred to is the method outlined by the statute for the termination or cancellation of the bond itself. It is our further view that the termination of the Killion-Shores partnership *terminated any liability for future debts of Shores* and that the termination of the Killion-Shores partnership simply meant and had the effect that *no obligation within the partnership bond was incurred by Shores' subsequent acts.* We think the failure to formally cancel the bond under the 10-day provision would not make either Killion or the surety company liable to plaintiffs and interveners under this record for the debts created by Shores subsequent to the dissolution of the Killion-Shores partnership.

Appellants also argue that the bonds in question were insurance contracts and not contracts of suretyship. We think this contention is not well taken. See 39 Tex.Jur. 1027.

We hold that under this record the trial court was correct in holding that the dis-

solution of the Killion-Shores partnership terminated the liability of the surety on the bonds in question for the debts of the Killion-Shores partnership and that Killion and the surety were not liable for debts created thereafter by Shores. We further hold under the record in this case, and as found by the trial court, that the surety was not estopped to plead that it was not liable under the bonds for Shores' acts subsequent to the dissolution of the partnership. Appellants' second and third points are respectfully overruled.

Since our holdings above on appellants' Points 2 and 3 are determinative of this appeal and require an affirmance of the judgment of the trial court irrespective of appellants' other points, we deem it unnecessary to discuss at length appellants' other points. However, we will make the following brief observations:

We are inclined to the view that the trial court was correct in holding that the bonds in question were not statutory bonds because they were not filed with the County Clerk as specifically required by Article 1287a, V.A.C.S. Appellants' first point is respectfully overruled. However, if we be mistaken in this, we are firmly convinced that the trial court was correct in holding that the bonds in question were not statutory bonds insofar as they exceeded the statutory amount of $1,000. See Meador v. Adams, 33 Tex.Civ.App. 167, 76 S.W. 238.

We also think that the trial court correctly held that the bonds in question (which were sued upon only as statutory bonds) could not be supported as common law bonds. See the following authorities: Johnson v. Erskine, 9 Tex. 1; Hillman v. Mayher, 38 Tex.Civ.App. 377, 85 S.W. 818; Wooters v. Smith, 56 Tex. 198; Pierce v. Wallace, 48 Tex. 399.

We also think that the trial court correctly held that appellant Lum Brothers' claims did not come within the scope of the bonds or of Article 1287a. Appellant Lum Brothers' fourth point is respectfully overruled.

In any and all events, we hold that the able and learned trial judge rendered a correct judgment in favor of defendants.

Finding no reversible error in the record, the judgment of the trial court is affirmed.