**PINEMONT BANK, Plaintiff-Appellee,**

v.

**Henderson BELK, Defendant-Appellant.**

**No. 82–2211.**

United States Court of Appeals,
Fifth Circuit.

Jan. 12, 1984.

Rehearing Denied Feb. 23, 1984.

Don Fogel, Kevin Risley, Houston, Tex., for defendant-appellant.

Stanley B. Binion, Ann Ryan Robertson, Houston, Tex., for plaintiff-appellee.

Before WISDOM, TATE and GAR-WOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Pinemont Bank ("the Bank") brought this diversity suit against Henderson Belk ("Belk") to recover on a guaranty for $300,-000 which Belk had allegedly executed on behalf of Prestige Imports, Inc., a corporation which had defaulted on several loans from the Bank. The district court granted judgment for the Bank for $300,000, plus interest and attorneys' fees. Belk appeals, alleging that because several of the district court's findings were clearly erroneous and because the court's interpretation of the law was flawed, we should reverse and render judgment for Belk. Alternatively, Belk contends that he is entitled, at the least, to a jury trial on remand, because the district court abused its discretion by denying Belk's pretrial motion for a jury trial under Fed.R.Civ.P. 39(b). Although we find that Belk is not entitled to have the district court's judgment reversed and rendered in his favor, we nevertheless hold that Belk was erroneously denied a jury trial and therefore reverse and remand for another trial on that ground.

In the early 1970's, the Bank, a Texas state bank, began doing business with Gulf Import Autos, Inc. ("Gulf Import"), a corporation which was in the business of selling new and used cars. Gulf Import was owned by a Mr. and Mrs. Johnson. The Bank extended a working capital loan, several installment loans, and a floor plan loan to Gulf Import.

In 1976, Billy Tyson and William King began negotiating with the Johnsons to buy their stock ownership in Gulf Import. King and Tyson also met with officials from the Bank to determine whether the Bank would be willing to continue to finance Gulf Import after King and Tyson bought it. The Bank indicated that it would only finance Gulf Import or the men individually if they could obtain the backing of someone with the financial ability to guarantee their loans. After Tyson and King informed the Bank that Henderson Belk, a North Caroli-na resident, would be willing to guarantee their loans, the Bank wrote to Belk and asked him to execute two guaranties. Belk executed and returned the guaranties; a $300,000 guaranty of Gulf Import and a $25,000 guaranty of William King, both dated October 22, 1976.

After the transaction with the Johnsons was completed, Tyson and King assumed the operation of Gulf Import. In November 1976, the United States government filed a federal tax lien against Gulf Import to recover unpaid withholding taxes. To circumvent the lien, the Bank, King, and Tyson formulated a plan whereby the Bank would foreclose on Gulf Import's assets, and King and Tyson, through Prestige Imports, Inc. ("Prestige"), another corporation they wholly owned, would buy the assets of Gulf Import at the foreclosure sale.

On December 2, 1976, the Bank, through its vice president, William Pickens, sent a letter to Belk asking him to execute a new $300,000 guaranty for Prestige. The letter explained the plan to Belk:

"Mr. King and Mr. Tyson are now in the process of establishing their car sales under the corporate name of Prestige Imports, Inc., and there will be a sale on Monday, December 13, 1976, at 2:00 P.M. of all Gulf Import Autos vehicles. Mr. King and Mr. Tyson plan to purchase these vehicles as the new corporation mentioned earlier. Upon consummation of the sale on December 13, 1976, Pinemont Bank will cancel your previous Guaranty Agreement for Gulf Import Autos, Inc. in the amount of $300,000.00 and will return same to you. Therefore, I have enclosed a Guaranty Agreement for Prestige Imports Inc. in the amount of $300,000.00 which Mr. King and Mr. Tyson have asked that I mail for your signature."

Soon thereafter, the Bank received the $300,000 guaranty, purportedly signed by Belk. Although Belk denies that he executed the guaranty, a handwriting expert at trial testified that, in his opinion, Belk had signed the guaranty. In addition, the district court found that "[t]he signature of

Henderson Belk on the guaranty agreement dated December 2, 1976 is genuine."

In January 1977, the Bank held the foreclosure sale on Gulf Import's assets. The Bank loaned money to Prestige with which Prestige purchased the assets—Gulf Import's automobiles—at the sale. Later, in April 1977, Tyson purchased King's interest in Prestige.

On July 18, 1977, the Bank sent Belk a letter which summarized earlier transactions between the Bank, Prestige, and King and Tyson. The letter concluded by explaining that the Bank had decided to grant Prestige a line of credit for $425,000 consisting of a $100,000 line of credit (unsecured loan) and a $325,000 line to be used to carry a new and used car floor plan line based upon the cost of the automobiles purchased. Enclosed with the letter was a guaranty for $425,000 for Belk to sign and return to the Bank. Belk never executed the guaranty, but the Bank continued to make loans to Prestige. Those loans were evidenced by four notes. The first, dated August 28, 1979, was for $350,000; the second, dated September 11, 1979, was for $85,000; the third, dated July 24, 1980, was for $64,331.42; and the fourth, dated April 24, 1979, was for $17,248.26.

During the course of its relationship with Prestige, the Bank sent several letters to Belk informing him of the financial status of Prestige. Belk never responded to these letters. In a letter of February 1, 1980, James Thomas, the Bank's president, informed Belk that the Bank could not continue to fund Prestige or Tyson until it had evidence of Belk's seriousness to fund the guaranty he had executed. The letter asked Belk to increase the guaranty to $350,000 and to secure the guaranty with marketable securities with a market value of 130 percent of the guaranty, or to at least secure the current guaranty of $300,-000 with marketable securities at the 130 percent rate. When Belk did not respond, the Bank sent him a letter dated March 12, 1980, demanding that he secure the $300,-000 guaranty with marketable securities. Belk never secured the guaranty.

On June 5, 1980, with Prestige having fallen substantially behind in its repayment on the notes, the Bank made a formal demand of Prestige for a payment in full of all principal and accrued interest due to the Bank under the four notes. On the same date, Thomas wrote to inform Belk that the Bank had demanded that Prestige pay the amount due under the notes, which exceeded the limit of Belk's guaranty of $300,000. The letter then made a formal demand that, within thirty days, Belk pay the $300,000 he had guaranteed. Belk never paid the $300,-000, and the Bank filed this suit to recover the $300,000 allegedly owed it under the guaranty, plus interest and attorneys' fees.

Having denied Belk's motion for a jury trial made one week before trial, the district court gave judgment for the Bank in a bench trial. Belk contends on appeal that the district court abused its discretion in denying the motion for jury trial, and that its findings of fact were clearly erroneous and its interpretation of Texas law was in error. We first address the jury trial issue.

The Seventh Amendment to the United States Constitution preserves the right to trial by jury in "Suits at common law." Plainly, this was a case in which Belk would have been entitled to a jury trial, if a jury had been properly demanded, and the parties do not suggest otherwise. Rule 38(b), Fed.R.Civ.P., however, requires that a party make a demand for a jury "in writing at any time after the commencement of the action and not later than ten days after the service of the last pleading .... Such demand may be endorsed upon a pleading of the party." A party's failure to comply with Rule 38 constitutes a waiver by him of his right to trial by jury. Fed.R.Civ.P. 38(d).

The strictures of Rule 38 are, though, tempered by Fed.R.Civ.P. 39(b), which allows a court, within its discretion, to grant a late motion for a jury trial:

"By the Court. Issues not demanded for trial by jury as provided in Rule 38 shall be tried by the court; but, notwithstanding the failure of a party to demand a jury in an action in which such a de-

mand might have been made of right, the court in its discretion upon motion may order a trial by a jury of any or all issues."

Belk alleges that the district court erred in denying him a jury trial under both Rules 38(b) and 39(b). To determine the merits of this claim, we must scrutinize the relevant pretrial developments.

The record clearly reflects that neither the Bank's original nor its amended complaint contained a formal jury demand, and that neither Belk nor the Bank complied with Rule 38(b) by filing a separate jury demand within ten days after the last pleading was served. Belk does not contend otherwise. However, on the cover sheet to the Bank's amended complaint (filed prior to any answer or motion filed by Belk other than a motion to dismiss for want of personal jurisdiction), the Bank's counsel inadvertently checked the box indicating that a jury demand had been made.[1] This cover sheet (or a copy thereof), containing the erroneous statement that a jury had been demanded, was attached to the amended complaint and served on Belk.

■ Belk argues that the Bank's service of the cover sheet indicating that a jury had been demanded was sufficient to comply with the requirement of Rule 38(b) that a party desiring a jury trial serve a jury demand on the opposing party within ten days after service of the last pleading. If, indeed, the Bank's service of the mismarked cover sheet on Belk had been sufficient to constitute a Rule 38(b) jury demand, Belk could have relied on that demand. In that case, he would not need to have filed his own demand to ensure that the trial would have been before a jury. *Southland Reship, Inc. v. Flegel,* 534 F.2d 639, 643 (5th Cir. 1977).

The First Circuit has stated, however, that "the notation on the Cover Sheet is not a substitute for the service of written notice on the defendants required by the Federal Rules." *Omawale v. WBZ,* 610 F.2d 20, 22 (1st Cir.1979), citing *Biesenkamp v. Atlantic Richfield Co.,* 70 F.R.D. 365 (E.D.Pa. 1976).[2] Although this Court has never explicitly held that marking a timely filed cover sheet of this kind will not bring a party within Rule 38(b), it is possible to infer that this Court so concluded in *Cox v. C.H. Masland & Sons, Inc.,* 607 F.2d 138 (5th Cir.1979). There, the Court apparently assumed that the plaintiff had waived his right to a jury trial under Rule 38(b) by failing to make a timely demand. The Court explained, without further comment, that the plaintiff had "stated that he thought he had originally demanded a jury by marking the cover sheet to his suit." *Id.* at 143 n. 5. There is, however, no express indication of whether the thus marked cover sheet, or a copy of it, was served on the defendant.

■ We do not reach the issue of whether checking the jury demand box on the amended complaint's cover sheet and timely serving it on the opposing party constitutes service of a jury demand for the purposes of Fed.R.Civ.P. 38(b). However, we specifically caution all counsel that in any event it is plain that such is not the preferred method of compliance with Rule 38(b), and that it is fraught with danger for the party relying on it.

Belk argues that even if compliance with Rule 38(b) were not achieved, nevertheless the district court's failure to grant his Fed. R.Civ.P. 39(b) motion for a jury trial was an abuse of discretion. We agree with this contention.

■ Under Rule 39(b), "notwithstanding the failure of a party to demand a jury in

---

1. The cover sheet form bears a preprinted notation substantially as follows: "Jury Demand: Check 'Yes' only if demanded in Complaint. Yes _____ No _____."

Apparently, the cover sheet prepared with the original complaint did not indicate that a jury had been demanded.

2. *Biesenkamp* appears, however, to rest on the fact that the cover sheet so marked (or a copy thereof) was not served upon the defendants. The *Omawale* opinion contains no indication of whether or not there was any such service.

an action in which such a demand might have been made of right, a court in its discretion upon motion may order a trial by a jury of any or all issues." This Court has interpreted Rule 39(b) to require a court to grant a motion for jury trial under the Rule "in the absence of strong and compelling reasons to the contrary." *Cox*, 607 F.2d at 144 (quoting *Swofford v. B & W, Inc.*, 336 F.2d 406, 409 (5th Cir.1964), *cert. denied*, 379 U.S. 962, 85 S.Ct. 653, 13 L.Ed.2d 557 (1965)).

■ Until the pretrial conference, held one week before trial, the district judge had the impression that this case was to be heard by a jury. His belief, coupled with the nature of this case and the events which led to Belk's filing of his Rule 39(b) motion, convinces us that no "strong and compelling reasons" existed for the district court's denial of the Rule 39(b) motion.

We first note again that the Bank's counsel did mark the amended complaint's cover sheet to indicate that the Bank had requested a jury trial. Belk claims, and the Bank does not argue otherwise, that the effect of this marking was to lead him to believe in good faith that the Bank had made a jury demand. We do not mean to suggest that Belk had no duty to look beyond the cover sheet to the pleadings to determine whether a jury demand had actually been made. We believe, however, that the effect which the mismarked cover sheet had on Belk—to make him believe a demand had been made—was probably not unusual. Neither party is free from responsibility for this confusion, but we believe that the Bank's act of mismarking the cover sheet, which instigated the confusion, is, on balance, more blameworthy than Belk's reliance on it. The mismarked pleading circumstance makes us somewhat sympathetic to Belk's plight and to the tardiness of his jury trial motion. We further observe that there is no suggestion that Belk was using the jury demand as a delaying tactic.

We do not rest our decision solely on our evaluation of the cover sheet's effect on Belk. We look also to the effect the mismarked cover sheet had on the district court, and to the resulting posture of the court before it was informed, at the pretrial conference, that no jury demand had been made.

When in June 1981 the Bank filed the amended complaint and cover sheet with the district court, the court clerk apparently marked the docket sheet to conform to the cover sheet's representation that a jury had been demanded. Hence, the front of the docket sheet, which gives the skeletal preliminaries of the case, is stamped "JURY REQUESTED." The first entry on the next page of the docket sheet reads, "1–20–81 ... ORIGINAL COMPLAINT w/JURY DEMAND, filed." An entry on the next page dockets the filing of a January 28, 1982 order which set the trial for the weeks of February 8 and 16, 1982, and the pretrial conference for February 1, 1982. The entry also states, "At that thime [*sic*] [counsel] are to present to the Court a Joint Pretrial Order *including proposed voir dire, proposed charge to the jury,* exhibit and witness lists." (Emphasis added.)

The following colloquy, which occurred between the parties' attorneys and the district judge at the February 1, 1982 pretrial conference, is also enlightening:

"THE COURT: How long is it going to take to try this case?

"[COUNSEL FOR THE BANK]: Shouldn't take more than two days at the very most.

"THE COURT: Jury case?

"[COUNSEL FOR THE BANK]: No, sir, it is not. We hadn't demanded one. Okay?

"THE COURT: Do you all have your Pretrial Order in?

"[COUNSEL FOR THE BANK]: Judge, we both worked on our respective versions of the Pretrial Order. It has not been finalized. We can have one, I suspect, later today.

" . . . .

"THE COURT: Wednesday is fine.

" . . . .

"LAW CLERK: Including proposed jury instructions.

"THE COURT: Not the general instructions, just specific instruction, especially on the law matters.

" . . . .

"THE COURT: I will allow the lawyers to do their own voir dire. You have got thirty minutes to do it, but I want to see the questions beforehand you will ask the jury. You are not limited to those questions because the answers the jury makes to other questions might lead to some more.

"[COUNSEL FOR THE BANK]: Shall we include those in the Pretrial?

"THE COURT: Yes."

As this excerpt shows, even after counsel for the Bank informed the district judge that this case was not to be tried to a jury, the judge continued to make references to procedures (*voir dire* and jury instructions) peculiar to a jury trial (without, we would note, further objection by counsel for the Bank). This exchange between the court and counsel, coupled with the docket entries discussed above, convinces us that as of the time of the pretrial conference, the district judge was prepared, and indeed expected, to try this case with a jury.

As explained earlier, a district court should grant a Rule 39(b) motion "in the absence of strong and compelling reasons to the contrary." Or, as this Court has also explained, "A motion for trial by jury submitted under Rule 39(b) should be favorably received unless there are persuasive reasons to deny it." *United States v. Unum, Inc.,* 658 F.2d 300, 303 (5th Cir.1981).

On February 3, 1982, two days after the pretrial conference at which Belk had learned for the first time that the Bank had not actually made a jury demand, Belk filed a motion for jury trial under Rule 39(b). The district court, denying the motion at trial, gave no reasons for the denial other than, "Not timely filed."

Untimeliness, however, insofar as that concept describes a motion which has been filed more than ten days after the last pleading was served, is principally a rationale for denying a motion under Rule 38. That Rule speaks to timeliness, *see* Rule 38(b)[3]; whereas, Rule 39 operates when a person has failed to comply with Rule 38(b).

The Bank suggests that allowing a jury trial under Rule 39(b) would emasculate Rule 38; that this Court's reversal of the district court's denial of the Rule 39 motion in this situation would take the bite out of the timeliness requirement of Rule 38. To every Rule, however, there must be a purpose, and the purpose behind Rule 39(b) appears to have been to allow a trial court to use its discretion to grant jury trials in unique situations which call for them where, nevertheless, the requisites of Rule 38 have not been met. We adhere to Wright and Miller's evaluation of decisions which have denied Rule 39(b) motions *solely* because parties have failed to comply with Rule 38:

"These decisions seem to place the emphasis in the wrong place. Technical insistence upon imposing a penalty for default by denying a jury trial is not in the spirit of the rules. The rules do not limit the court's discretion in ordering a jury in cases in which there would have been a right to jury trial. The court ought to approach each application under Rule 39(b) with an open mind and an eye to the factual situation in that particular case, rather than with a fixed policy against granting the application or even a preconceived notion that applications of this kind are usually to be denied." 9 C. Wright and A. Miller, *Federal Practice and Procedure* § 2334 at 115–16 (1971) (footnotes omitted).

---

**3.** We do not mean to suggest that in deciding whether to grant a Rule 39(b) motion, a judge may not take into consideration, among other things, untimeliness insofar as it concerns the proximity of the filing of the motion to the trial. *See, e.g., United States v. Unum,* 658 F.2d at 303. We surmise, however, from the district court's cryptic remark in this instance—that the motion was denied because it was "[n]ot timely filed"—that the court was speaking of the motion's untimeliness in a Rule 38(b) sense and was not considering the motion's proximity to the trial.

The particular factual situation presented to the district court appears to have presented no persuasive reasons to deny the Rule 39(b) motion. Belk could have righted his confusion about whether a jury trial had been demanded by a closer scrutiny of the pleadings, but that confusion would not have arisen but for the Bank's error in marking the cover sheet to its amended complaint. Of prime importance here, however, is that the district court had apparently been led to believe that the case was to be tried to a jury. Because the record indicates that the district court was prepared to try this case to a jury, granting the Rule 39(b) motion would not have unduly affected the court's administration of its business. It would presumably have required no change on the court's part. We cannot say that in the opposite situation— in which the judge believed that the case was to be tried solely to the court—it would be an abuse of discretion to deny a Rule 39(b) motion made at a comparable time before trial if denying the motion might disrupt the court's docket, schedule or general administration. We can imagine many such situations in which denial of a Rule 39(b) motion would be proper and well within the district court's discretion. In the case before us, however, uniquely characterized by the Bank's misleading cover sheet, Belk's good faith, and the district court's readiness up until a week before trial to try this case to a jury, the district court, having had no persuasive reason to deny the Rule 39(b) motion, abused its discretion in doing so.

The district court's granting the Rule 39(b) motion would have been disruptive only to the extent that it would have caused surprise to the Bank's counsel who apparently had prepared to try the case exclusively to the bench. Although the Bank asserts that granting the motion a week before trial would have prejudiced it by requiring its counsel to develop strategies to try the case to a jury, the Bank makes no allusions to what drastic changes in its trial preparation its counsel would have had to have made. At trial, the Bank relied exclusively on live testimony and documentary evidence, neither of which would have been inappropriate for a jury to receive and evaluate. *See e.g., United States v. Unum,* 658 F.2d at 303. The Bank has not indicated how forcing it to try its case to a jury on short notice would have worked a substantial, or even a minimal, hardship on it. *Id.* Moreover, it was the Bank's error which caused the confusion.

Additionally, the Bank argues that the "complexities" of this case made it particularly appropriate for a bench, rather than a jury, trial. *See Las Vegas Sun, Inc. v. Summa Corp.,* 610 F.2d 614, 621 (9th Cir. 1979), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980). Without passing on whether the Seventh Amendment right to jury trial comprehends a "complexity" exception, *see Ross v. Bernhard,* 396 U.S. 531, 538 n. 10, 90 S.Ct. 733, 738 n. 10, 24 L.Ed.2d 729 (1970), we find nothing about this case which makes it even arguably close to being unsuited for a jury's comprehension or decision. The prime issues at trial seemed to be whether Belk's signature on the December guaranty was genuine, and whether the Bank had relied on Belk's guaranty in extending credit to Prestige. These fact determinations would have been particularly within a jury's province.

In sum, the district court cited no persuasive reasons for denying the Rule 39(b) motion, and we can find none. Under the unusual combination of circumstances present here, we conclude that the district court abused its discretion in denying Belk a jury trial, and, since on the evidence presented the Bank would not have been entitled to a directed verdict, we accordingly must reverse and remand for another trial. *Cox,* 607 F.2d at 144–45.

We finally turn to what Belk has actually presented as his primary contention on this appeal, namely, that on the evidence at trial Belk was entitled to judgment, that the district court erred in failing to render judgment for him, and that accordingly we should not only reverse but should also ourselves render judgment for Belk as he says the district court should have done. The

principal basis of Belk's contention in this regard is his claim that the district court's finding that the Bank relied on his guaranty in making its loans to Prestige is clearly erroneous.

 Although at trial Belk introduced evidence tending to show that the Bank had not relied on Belk's guaranty in making its loans to Prestige, the Bank introduced evidence showing that reliance. We cannot say that the district court's finding of reliance was clearly erroneous, or that its subsequent determination of liability, based in part on its finding of reliance, was wrong as a matter of law.[4] Although this case may be decided differently on remand if the evidence or the fact-findings differ from those now before us, we cannot find the district court's determinations wrong as a matter of law. We therefore decline to reverse and render this case, but instead only reverse and remand for a new trial.

REVERSED AND REMANDED.

---

4. The parties addressed two other issues at trial which Belk also urges on us as grounds for rendition of judgment in his favor.

The first is whether the Bank's failure to actually cancel Belk's guaranty for Gulf Import—its failure to actually return the guaranty to Belk as promised in its December 2, 1976 letter—was a condition to Belk's being liable on the December guaranty of Prestige. Specifically, Belk argued that the Bank's failure to fulfill that condition relieved Belk of any liability on the guaranty of Prestige. However, the evidence does not conclusively establish that the Bank ever refused any request for a return of this guaranty or ever made demand on it (or treated Belk as having guaranteed the cumulative sum of both guaranties) after receipt of the guaranty sued on, or did anything other than innocently and immaterially forget to return the prior guaranty, or that Belk was in any way prejudiced by anything the Bank did or failed to do in that regard. The correspondence relied on by Belk does not conclusively establish his contentions in this regard.

Additionally, Belk argues that King's sale of his stock in Prestige to Tyson worked such a change in it as to preclude Belk's liability on the Prestige guaranty which he had executed when both Tyson and King owned Prestige. Belk relies on *Hunt Oil Co. v. Killion,* 299 S.W.2d 316 (Tex.Civ.App.—Texarkana 1957, writ ref'd n.r.e.), but that case involved a partnership, while here Prestige was a corporation, as the guaranty expressly reflects. Belk's guaranty was expressly a continuing one, contemplating future advances, Prestige continued to operate, as a corporate entity, the same business after King's sale of his stock, Prestige's indebtedness to the Bank related to the business, and Belk, when advised that King had sold his stock, made no effort to cancel the guaranty or communicate any doubt or disapproval whatever.

These contentions of Belk also seem rather at odds with his sworn testimony that he never executed the guaranty sued on.